UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>(1) ALEXANDER SAMUEL SMITH )<br>    a/k/a "Amir Alexander" ) | DOCKET NO. 3:17-cr-182-MOC<br><br>UNDER SEAL |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENSE MOTION TO PRELCUDE GOVERNMENT PROPOSED EXPERT TESTIMONY

Comes now, the United States of America, by and through R. Andrew Murray, United States Attorney for the Western District of North Carolina, who files this, the Government's Response in Opposition to the Defense Motion to Preclude Government's Proposed Expert Testimony (Motion to Preclude Government's Expert). On January 8, 2019, the Government filed Notice of its Intent to call Dr. Bruce Hoffman, Professor of Securities Studies at the Georgetown University School of Foreign Service and a Senior Fellow for Counterterrorism and Homeland Security at the Council on Foreign Relations as an expert on international terrorism and the Islamic State of Iraq and Syria (ISIS). *See* Document No. 49. As discussed in detail below, legal precedent firmly supports the admission of expert testimony to assist the jury in understanding the identity, nature and characteristics of international terrorist organizations. Dr. Hoffman's testimony regarding ISIS will assist the jurors in this case both as to the elements requiring proof of an international terrorism investigation and the context in which the alleged false statements were made. Wherefore, the Defense Motion to Preclude Expert Testimony should be denied.

I.  **BACKGROUND**:

   A.  *The Indictment Charges an International Terrorism Enhancement*

On June 21, 2017, the Grand Jury returned a Bill of Indictment against the Defendant, Alexander Samuel Smith, a/k/a Amir Alexander (SMITH), charging that he made two distinct materially false statements to federal agents conducting an investigation into whether he and others were planning to provide material support to ISIS, a designated foreign terrorist organization.  Indictment at ¶ 1, 21 & 23.  In Count One, SMITH is alleged to have lied to federal agents about whether he had ever discussed his desire and plan to travel to Syria to fight with ISIS.  *Id*. at ¶ 21.  In Count Two, SMITH falsely stated that he did not know that he was facilitating the purchase of a discounted airline ticket for a person traveling to Syria to support ISIS.  *Id*. at ¶ 23.  Introductory paragraphs outline how SMITH initiated contact with a Government source posing as an ISIS sympathizer in order to facilitate his travel to Syria on the condition that he join and fight with ISIS—the subject of Count One.  Indictment at ¶¶ 1-3. They also explain how SMITH used his girlfriend's status as an airline employee to purchase a discounted employee airline ticket for a person he was told would be traveling from Tampa, Florida, to Buffalo, New York, in order to cross into Canada and then to Turkey and Syria to join and fight with ISIS—the subject of Count Two.  *Id*. at ¶¶ 4-12.  Paragraph 20 alleges that: "[t]he circumstances surrounding SMITH's planned travel to Syria, his assistance to [the person who was to travel on the discounted airfare], and his interviews with [Federal Bureau of

Investigation (FBI)] Special Agents within the United States are matters within the jurisdiction of the FBI and the executive branch of the United States Government."

### B. *The Evidence is Replete with References to ISIS*

In order to prove that SMITH's false statements to the FBI were knowing and willful, the Government will present SMITH's emails, texts and consensually recorded telephone calls and meetings with a Government informant he believed to be an ISIS facilitator. SMITH initiated contact with this informant, whom he knew as "Abu Khalid," looking for help to travel to Syria. In his communications with Abu Khalid, SMITH discussed not only his plans to travel to Syria to fight with ISIS, but also his knowledge of the ISIS organization, its beliefs, extremists tactics, and hostility to the United States. In their first meeting, Abu Khalid told SMITH that he was "helping brothers to go to Syria to be with *Dawla Islam* what they call it English I-S-I-S…. Only in Arabic they call it *DAISH, Dawla Al-Islam Fi Al-Iraq Wa Al-Sham*." In a meeting on August 7, 2014, SMITH discussed his knowledge of ISIS and his desire to join and fight for its extremist ideals:

| | |
|---|---|
| *Abu Khalid:* | Okay? Insha'Allah, so you want to be with the Khalifah |
| *Smith:* | Insha'Allah |
| *Abu Khalid*: | ...Dawla Islam? You know what this mean? This mean you have to... have to bay'at to Khalifah. |
| *Smith:* | Na'am |
| *Abu Khalid:* | [UI]… You know who is Khalifah now? |
| *Smith:* | Yes, I know who's Khalifah. |
| *Abu Khalid:* | What his name? |

3

| | |
|---|---|
| *Smith:* | Abu Bakr al-Baghdadi |
| *Abu Khalid:* | Abu Bakr al-Baghdadi |
| Smith: | Na'am. |
| *Abu Khalid:* | If you give bay'at to Khalifah, this mean you gonna be in the power of Dawla Al-Islam Fi Al-Iraq Wa Al-Sham. You are going to fight for Allah—Subhanahu Wa Ta'alah—first, but you are going to be fighting with them. |
| Smith: | Na'am. |
| *Abu Khalid:* | That's good with you? |

In later conversations with Abu Khalid, SMITH affirms his desire to travel to Syria knowing that he could be fighting his own countrymen:

| | |
|---|---|
| *Abu Khalid*: | We are fighting a bigger enemy. You are not following the news? |
| Smith: | I don't pay that much attention, but I hear some things |
| *Abu Khalid*: | You know that we've been hit by the American Air Force? |
| Smith: | Yes |
| *Abu Khalid*: | So we have bigger enemy. We are not fighting only Syrian or Iraqian [sic] armies. We are fighting States… um… |
| Smith: | [UI] Inshallah [Translation: God willing] |
| *Abu Khalid*: | Yeah, okay… so we have bigger enemy. For that, the brothers are looking for… new brothers … a lot of brothers … it doesn't matter… they want some… new brothers with uh… with skills ... with training … with… so you don't have time to just start training people stuff. . . . |

4

SMITH later expresses his views on ISIS's use of extreme measures such as the beheading of journalists:

> *Abu Khalid*: Uh… Did you see what happened to that uh… journalist?
>
> Smith: Yeah, I heard
>
> *Abu Khalid*: You didn't see that video?
>
> Smith: No, I didn't see the video
>
> *Abu Khalid*: So, what do you think about that?
>
> Smith: Uh… well… I mean… I think… my opinion is this… in Islam, if you're going to do something, you should do it in the best manner. And that means even if you're going to kill someone, you should kill them in the best manner. That means that if you choose to behead a person, then I don't believe it is right to saw at a person's neck. I believe that if you behead a person, if should be one fast chop, painless to the person.

Most importantly with respect to the charged counts, SMITH discussed with Abu Khalid the means and methods by which ISIS fighters such as himself and Mohammed Hilal—a person described to him as computer analyst from Tampa, Florida—could travel undetected from the United States to Syria via Canada and Turkey.

### C. *Dr. Hoffman's Proposed Testimony*

As stated in the Government's Notice of Expert testimony:

> Dr. Hoffman will testify that ISIS is and in 2014-2017 was, an international terrorist organization. He will explain the history and structure of ISIS as it existed in the 2014-2017 timeframe. Dr. Hoffman will discuss the relationship between ISIS and the United States and other western countries. He will also explain the relationship between ISIS and the Syrian government, the Syrian civilian population and the role that ISIS played in the Syrian civil

> war. Dr. Hoffman will discuss ISIS's methods of communication used internally and externally as well as the means by which ISIS recruited individuals internationally to participate in the armed conflict in Syria.

Government's Notice, Document No. 49 at 2.

In addition to its Notice, the Government provided the Defense with materials it received from Dr. Hoffman, including his Expert Report [on ISIS] Prepared for the State Coroner of New South Wales in the Inquest Into Death's Arising from the Lindt Café Siege; an ISIS pamphlet published in 2015 entitled "Hirjah to the Islamic State" including tips on what to pack, who to contact and where to go when traveling to join ISIS in Syria; maps of the territory occupied by ISIS in 2014-2016, and an ISIS tutorial on encrypted communications.

## II. APPLICABLE LAW

As the defendant appropriately sets forth (Motion at 2), Rule 702 of the Federal Rules of Evidence establishes the basis for admission of expert testimony. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case.

6

Rule 702 therefore prescribes essentially a two part test: first, the witness must be qualified, demonstrating knowledge, skill, experience, training or education in the field, and second, the testimony must be able to assist the trier of fact. *See Daubert*, 509 U.S. 579 (1993); *United States v. Hite*, 769 F.3d 1154, 1169 (D.C. Cir. 2014) (the Court "must ensure that the proffered testimony is both relevant and reliable") (citing *Daubert*, 509 U.S. at 590, n. 9).

When reviewing an expert's qualifications, the Court must ensure that the testimony "rests on a reliable foundation." <u>Daubert</u>, 509 U.S. at 597; *accord Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). To do so, the Court should consider the criteria listed in Rule 702 and may consider other indicia of reliability enumerated in *Daubert*:

> (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the technique's known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation"; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 593-94). "The test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.,* 526 U.S. at 141. Courts have "considerable leeway in deciding in a particular case how to go about determining whether particular testimony is reliable." *Id.* at 152. The object is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. Rule 702 "is to be broadly interpreted." *Mannino v. International Manufacturing Co.*, 650 F.2d 846, 849 (6th Cir. 1981). As the Advisory Committee Notes to Rule 702 explain:

7

> The rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the "scientific" and "technical" but extend to all "specialized" knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training or education."

F.R.E. 702 Advisory Committee Notes to 1972 Proposed Rule. *See also Mannino*, 650 F.2d at 849 ("The Advisory Committee's notes explain that whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier of fact. The rule is broadly phrased, and an expert is viewed, not in a narrow sense, but very broadly.")

When reviewing the relevance of proposed expert testimony, the Court "must determine whether an expert's opinion on the subject will 'assist the trier of fact,' or, in other words, be helpful to the jury." *United States v. Kassir*, No. S2 04 Cr. 356 (JFK), 2009 WL 910767, at *7 (S.D.N.Y. Apr. 2, 2009) (denying motion to preclude expert testimony regarding al Qaeda and related topics) (quoting *United States v. DiDomenico*, 985 F.2d 1159, 1163 (2d Cir. 1993)), *aff'd sub nom. United States v. Mustafa*, 406 Fed. Appx. 526, 528-29 (2d Cir. 2011). The "Rules of Evidence provide a liberal standard for the admissibility of expert testimony," *United States v. Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003), as "[e]xpert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). *See United States v. Boney*, 977 F.2d 624, 628 (D.C. Cir. 1992) (recognizing that a decisive factor in determining whether the expert testimony would be helpful is whether the jury has a common knowledge of the subject matter of the testimony).

8

## III.    DISCUSSION

The admission of Dr. Hoffman's expert testimony explaining international terrorism and ISIS is clearly appropriate under the inclusive standard discussed above.   First, the Defense Motion to Preclude Expert Testimony does not challenge Dr. Hoffman's credentials and his *curriculum vitae* attached to the Government's Notice of Expert leaves no doubt that his qualifications are reliable.   In fact, he has been previously qualified as an expert witness in the study of terrorist organizations by courts in the United States, Australia, and the United Kingdom.   Nor does the Defense claim that national security and international terrorism are not recognized fields of specialized knowledge.   *See* Studyportals, *Bachelor Degrees in Terrorism & Security in the United States*, < https://www.bachelorsportal.com/study-options/269779264/terrorism-security-united-states.html (last updated March 15, 2019)(listing 119 Bachelor degree programs in national security and terrorism).   Second, the proposed testimony is helpful to the jury's understanding of ISIS as a designated international terrorist organization—an element of the charged enhancement.   It also provides the context for SMITH's false statement, including where it was operating at the time of the charged offenses, its structure, and recruitment of Westerners.   Phrases such as "swearing bayat," "khalifah," and "Dawla-Islam"—which will appear throughout the evidence—are not terms familiar to most Americans.   Likewise, the significance of Abu Bakr al-Baghdadi and ISIS's use of extreme violence to enforce its ideology require explanation.

Notwithstanding these issues, the Defense asserts that expert testimony concerning the nature and characteristics of ISIS is improper in this case because it is charged as a false statements case under 18 U.S.C. § 1001, rather than a material support case under 18 U.S.C.

9

§ 2339B. Motion to Preclude at 2-3. There is simply no support for the Defense contention that terrorism experts have only have been admitted with regard to cases charged under § 2339B. In *United States v. Benkahla*, 530 F.3d 300 (4th Cir. 2008), the court admitted expert testimony about various aspects of radical Islam in a false statements case. Despite the fact that material support was not charged, the court found that, "[t]he evidence in this case was complicated, touching by necessity on a wide variety of ideas, terms, people, and organizations connected to radical Islam." *Id.* at 309. As a result, the court listed a series of terms raised in the indictment and, rather than restricting the scope of appropriate testimony, explained that, "Of course, the evidence required to evaluate the indictment involved a broader frame of reference still. In these circumstances, the trial judge could well conclude that lengthy testimony about various aspects of radical Islam was appropriate, and indeed necessary, for the jury to understand the evidence and determine the facts." *Id*. at 310 (internal quotations omitted).

Moreover, contrary to the Defense Motion, the charges in this case specifically allege that that SMITH's false statements were made in the course of an FBI investigation involving "international terrorism." Indictment at ¶¶ 22 & 23. Section 1001 gives "international terrorism" the same definition as in 18 U.S.C. § 2331, which provides that an offense involves international terrorism if:

- First: The offense involves violent act or acts dangerous to human life that are a violation of the United States or of any State, or that would be a criminal violation if committed within the United States or of any State;

- Second: That it appears to be intended to intimidate or coerce a civilian population, or to influence the policy of a government by intimidation or coercion, or to affect the conduct of a

10

> government by mass destruction, assassination, or kidnapping; and
>
> Third: That it occurs primarily outside the territorial jurisdiction of the United States, or transcends national boundaries in terms of the means by which the acts are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which the perpetrators operate or seek asylum.

The Defense Motion to Preclude Expert Testimony ignores this element of the charged offense. Motion at 5. The Defense also omits that the Government must prove that SMITH's statements were material to the FBI's investigation. A statement is material if it is capable of influencing a function within the agency's jurisdiction. *See Brogan v. United States*, 522 U.S. 398, 402 (1998) (rejecting the "exculpatory no" doctrine.) In this regard, the Government must prove the scope of the FBI's investigation in order to show how it could be influenced by SMITH's false statements. This determination is intertwined with the pervasive threat of ISIS at its apex from 2014 through 2016. Thus, Dr. Hoffman's expert testimony concerning ISIS and its designation as an international terrorist organization is directly probative of at least two elements of the charged offenses.

Even if Dr. Hoffman's testimony were not directly relevant to the elements of the charged offenses, it would still be admissible to give the jury an understanding of the background to the case. Indeed, precedent supports the admission of expert testimony regarding the "history, structure, organization, membership, and operation" of various groups, including terror groups. *United States v. Sabir*, 2007 U.S. Dist. LEXIS 34372, *36 (S.D.N.Y. 2007); *see also United States v. Mostafa*, 2014 U.S. Dist. LEXIS 60825, *9-11 (S.D.N.Y. 2014) (admitting testimony on al Qaeda's history, structure, leadership, political agenda and methods of training and recruitment to help the jury determine whether the defendant supported the

11

organization); *Kassir*, 2009 U.S. Dist. LEXIS 28837, at *11 ("[A] number of courts have permitted expert testimony on the history, structure, leadership and methods of al Qaeda and other terrorist organizations."); *Paracha*, 2006 U.S. Dist. LEXIS 1, *65 ("The government may elicit expert testimony regarding al Qaeda's origin, leadership, and operational structure, as such testimony will aid the jury in understanding how al Qaeda came to be and the manner in which it currently functions."); *United States v. Amina Farah Ali*, 2011 U.S. Dist. LEXIS 113818, *9-10 (D.C. Minn. 2011) (denying defendant's motion to limit expert testimony, which would include background on Somalia, the Somali conflict, and details about al-Shabaab).

Finally, there is no merit to the Defense contention that Dr. Hoffman's testimony will improperly profile the defendant. Motion at 3-4 (citing *United States v. Jones*, 913 F.2d 174, 176-177 (4th Cir. 1991). In *Jones*, a North Carolina State Bureau of Investigation Agent testified at trial as an expert witness in the area of drug dealing operations. *Id*. at 176-77. The court found that any relevance of testimony that crack dealers often sell crack in small quantities was outweighed by the danger of unfair profiling of the defendant. *Id.* Dr. Hoffman will offer no such profiling characteristics. Nor will Dr. Hoffman state any legal conclusion. *Cf.*, *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) ("Expert testimony that merely states a legal conclusion is less likely to assist the jury in its determination"). Instead, as shown above, Dr. Hoffman's testimony will be confined to the issues outlined in the Government's Expert Witness Notice. (Doc. No. 49.)

12

WHEREFORE the United States respectfully requests that the Defense Motion to Preclude the Government's Expert Testimony be denied.

Respectfully submitted this 15th day of March 2019.

>R. Andrew Murray
>United States Attorney
>s/ Michael E. Savage
>Assistant United States Attorney
>North Carolina Bar Number 33159
>Attorney for the Plaintiff
>227 West Trade Street, Suite 1650
>Charlotte, North Carolina 28211
>704/338-3166 (Direct Line)
>704/227-0197 (Fax)
>mike.savage2@usdoj.go

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all parties and counsel of record by submitting it to the Court's Electronic Filing System.

//s// Michael E. Savage
Assistant United States Attorney
