Honorable Max O. Cogburn
United States District Judge
100 U.S. Courthouse Building
100 Otis Street
Asheville, NC 28801

Re: USA v. Alexander Smith, Case No: 3:17cr 182

March 9, 2020

Dear Judge Cogburn,

This report is written pursuant to your request for an evaluation of Alexander Samul Smith for providing the court with input regarding his risk to commit terrorism offenses as that may relate to his sentencing.

**<u>Professional Background and Experience</u>**

I am a licensed physician in the State of Illinois. My license number is 36090563. Since 2005, I have been a *Professor of Psychiatry* at the University of Illinois-Chicago ("UIC"). Since 2017, I have served as the *Director for Global Health* at UIC. I was employed as an *Assistant Professor of Psychiatry* at both Yale University and UIC from 1992-2005.

I have served as the *Co-Director of the Committee on Terrorism and Political Violence*, of the American Psychiatric Association (2004-). I have researched and published relevant scholarly materials regarding *Building Resilience to Violent Extremism in Muslim American Diaspora Communities* (Dynamics of Asymmetric Conflict 2012); *Community Resilience to Violent Extremism* (Georgetown Journal of International Affairs 2013); *Integrating Mental Health and Education Fields into Countering Violent Extremism* (Grant Support U.S. Dep't of Homeland Security 2015); *Guiding Principles for Countering and Displacing Extremist Narratives* (Journal of Terrorism Research 2016); *Addressing Violent Extremism as Public Health Policy and Practice* (Behavioral Sciences of Terrorism and Political Aggression 2016); I have published the following articles relevant to this case, *How to Stop ISIS from Recruiting Americans*, (September 11, 2014 CNN.com).[1]

The information contained within this report was prepared, is the work product of the undersigned, and is true to the best of my knowledge and information.

On March 21, 2019, Mr. Smith was convicted of two counts of False Statement to an Agency of the United States (Class D Felony). He was arrested on June 29, 2017 and released on July 20, 2017 on a $25,000 unsecured bond with Pretrial Services supervision to include home detention and location monitoring. He was remanded into custody on March 21, 2019 upon guilty verdict. The jury returned a special verdicts finding that the Mr. Smith's offenses involved international terrorism as defined in 18 U.S.C. § 2332b (g) (5).

[1] See Curriculum Vitae for more. (Attachment A)

According to the Indictment, It should be noted that the offense conduct occurred ***between 2014 and 2016***, and at the time of his conviction, **Mr. Smith had been out of custody awaiting trial for more than 5 years without any incidents of terrorism or violence**.

Mr. Smith's Counsel, Kevin Tate, retained me to evaluate Mr. Smith regarding his potential likelihood of committing future violence especially associated with extremism. Mr. Smith is a 31-year-old married man who resided in Waxhaw, North Carolina. He is married and has two children (a son and a daughter).
Mr. Tate provided me with the following documents that I reviewed:

1. Presentence Investigation Report
2. Government's Objection to the Pre-Sentence Report
3. Bill of Indictment
4. Objections to Draft PSR
5. Report of Psychological Forensic Evaluation from Dr. James Hilkey
6. Reply to Government's Opposition to Reconsideration of Release Pending Sentencing
7. Response in Opposition to the Government's Objection to the Pre-Sentence Report
8. Eight transcripts of conversations between Mr. Smith and government operative Abu Khalid occurring in 2014-2015.

On October 22, 2019, I met with Mr. Smith in the Mecklenburg County Jail for approximately 3 hours and conducted an interview.

In this report, I will: 1) describe my findings based upon the records presented to me and my interview with Mr. Smith; 2) present my opinions in response to Mr. Tate's questions; and 3) summarize my opinions.

## History

According to the government's speaking indictment, Mr. Smith, "met and communicated with a person he understood to be a supporter of the Islamic State of Iraq and al-Sham ("ISIS"), a designated Foreign Terrorist Organization. Mr. Smith discussed with this individual his desire and plans to travel to Syria and offered his assistance in helping others to travel to Syria in support of ISIS." Further details of that indictment are available in the cited materials."

Regarding his current legal situation, Mr. Smith stated: "The government has deemed me some kind of terrorist…If everything the government alleged against me was true, I'd have no problem. You got me. But me knowing what my intensions were, ultimately to help not to hurt anyone, it's kind of frustrating to me."

Mr. Smith was born and raised mostly in Charlotte, North Carolina. His mother and father never married. His mother remarried to a man he described as "scumbag abusive" and a "sick person." This man violently abused his mother and sexually abused his sister. This occurred when his sister was ages 8 to 12, which she reported when she got older. "It taught me there's always going to people in this world that are not for humanity. I learned from that that you got to be able to protect yourself and your family." His mother divorced this man after about five years.

His mother drove a cab. "My mother did her best. She took care of me. I never really had a male role model until Paul came along." Paul, who was the maintenance man at their apartment complex, became a mentor.

His father was "in and out" and he took to protecting his family. "That's all I've been doing nonstop for the past 5 or 6 years."

He was an average student but most of the time he had other priorities, such as "Trying to be cool. Trying to fit in to the culture." He went to Olympic High School and dropped out in the 10th grade to start working. He continued reading in history, philosophy, and technology. He read the Koran, Plato, Socrates, Aristotle, and Marcus Aurelius. He attended some GED classes but never got his GED.

At age 15, his friend Paco was killed in a gang related shooting. He thought, Maybe I'm next." He had been baptized when younger and attended Sunday school. He started looking into different religions. "I went about trying to disprove Islam. I didn't find contradictions I found in other religions. It made sense to me." His mother was happy that he wasn't smoking and drinking. He studied with a several different scholars: Ahmed Noor, a Somali, and Shamodin from North Caroline, and another Imam from Minnesota.

His mother, age 49 lives in Waxhaw, NC. Mr. Smith has four siblings. He and Christine Smith, age 29, have the same parents. She lives in Waxhaw, NC. He has a maternal half-brother, James Adams, age 40, whose location is unknown. He has two paternal half-siblings, Josh Israel, age 34, who lives in Greensboro, NC, and Karen Chandler, age 40, who lives in Durham, NC.

He met his wife, Palak Sheth, in high school and they have been together for 13 years. They married 2 years ago. She is a Hindi from Gudjarat, who converted to Islam. They have lived in Waxhaw, NC since 2004, in rented a home. They have two children, a son and a daughter. "My son and my daughter are the only two things I care about in this world. I don't want them to grow up without a father. To feel lost like I did."

He spoke about how having a son changed his attitudes. "Before I had aspiration and thoughts about life but I realized I'm there for him. I'm supposed to be there for him. I get a chance to make sure I can give him what I wasn't given. Being here away from him it is just messed up."

His mother took a job, in a fast food restaurant. His wife works for a bank. His family is also caring for his younger sister's five children because she is "strung out." He reported that he was in the process of getting custody of all her children. "I was the main breadwinner for the family. I worked seven days a week."

He was able to form a relationship with his father for the last three years of his father's life (he died four years ago). His father also converted to Islam.. "I buried him with my own hands…I've always had a moral obligation to people. That was my obligation to bury him."

He worked in private security. He wanted to take law enforcement training or to become a private investigator. He was employed at Empire Security, and during pre-trial supervision he worked with Forward Air doing warehouse work and then Peak Limo. Several times, he failed to adhere to the location monitoring guidelines and communicating his work schedule and whereabouts. Now he wants to get out of that field and get into Microsoft system engineering.

Mr. Smith reported using marijuana and alcohol beginning in elementary school. He progressed to using marijuana daily and consuming up to a six pack of beer a day.

He reported that the first time he was arrested for disturbing the police, "they scanned my eyes." Every time he flew he would be selected for screening. He was denied military service in 2012.

In 2016, he was arrested for assault involving weapons. "On Christmas Eve I had been drinking heavily, I went to store, and there was an incident with 6 or 7 people. They jumped me. I had a weapon. I pulled the weapon and I shot. Get off me stop. I did it as a deterrent. That is the only charge I had as a weapon." Because he worked in private security, he always carried a registered handgun.

In 2017, at age 18 he was convicted of Disorderly Conduct and Noise Ordinance Violation and was imprisoned for 45 days and given 12 months of unsupervised probation.

Mr. Smith converted to Islam in 2004 when he was 15. He had been working construction with some guys who were Syrian, a man named Wael and his son Sayed. Wael's mother was ill in Syria and he was going to check on her. "He invited me along. I said sure. Saved money. I left with him." Mr. Smith was 17-years-old at the time. He saw that Syria was a police state and he recalled telling the persons he met: "I hope one day you guys get a president you want and deserve." He also remembers feeling accepted in Syria; "They didn't see color. They didn't see I'm biracial. They didn't see black or white. They just saw me as me. They didn't care."

He reported that after he returned from Syria in 2006, "the attitude of the U.S. government dramatically changed towards me. I was brought in, interrogated; they kept asking me, did I have any military training, anything about explosives. Did I have any Arabic in my bloodline?"

During the Arab Spring he recalled, "Here I watched in horror as peaceful protesters were shot at, beaten, brutally as asking for a government that represents us." Then later, "When the war started developing I felt scared. I am worried about people being gabbed up by secret police. I am hearing about the stories."

He was hoping the Obama administration would "Stop this barbaric stuff from happening", but when the red line was crossed, nothing happened. "I felt powerless and helpless. The very people who took me and showed me hospitality they were being killed for no reasons." He was involved in raising money in the local community to support refugees.

After the war broke out, Wael's mother died and the he went to go care for his family. Wael said, "Would you like to come? Would you like to help us?" Mr. Smith told him that he wasn't ready, as he had a new lease and was taking care of his mother.

Mr. Smith said that if he was to go to Syria his goal was to be one of the "white helmets" who would "pull people out of the rubble. My desire was to do my part, to help people that was being bombarded. That was my intention." He saw the war progressing and Sayed left for Syria. "I'm the only one among them that's here. Like a blood brother. We shared experiences. My lease ran up, and I said, the chemical weapons thing happened, it got me thinking, these people aren't getting any help. Governments aren't going to help. I don't see America helping. So finally I had a report from family that their house was hit in airstrikes. The same house I was in. The father was injured with shrapnel in his side and stomach. I'm like holy shit, this is not directly affected the people I know, who I was with. So I felt more of a sense of urgency to do something. I said I want to come and help and do something. Humanitarian. Getting people out of the rubble. Support the family. I don't have the money to get there."

He spoke with Waed and told him, "I want to be with you, but I don't have the finances. He said, 'I have a childhood friend I grew up with that can get you the money to travel. The guy was in Tennessee. So I contacted him. He said. 'I'm in Tennessee I have something in Charlotte who can get you the money.' He told me that person worked with Doctors without Borders."

When he met this man, who didn't work for Doctors Without Border, the man asked, "'What are your intentions?'" I said, 'People in Syria I care about, I want to make sure they are OK.' He said, 'I'm only helping people that are involved with ISIS. The only help I will give you is if you are OK with this group. In Arabic I'm saying 'Na'. I said ok. But I didn't commit to that. I don't care about any ISIS ideology. My stuff was broader than that. It's about humans. It's about what's right. I called Wael. 'The guy you set me up with asked me if I am alright with the group. What is going on? This is not what I signed up for. He told me the guy in Tennessee is not really with the group and all I had to do was get the money and come. I was thinking there might be a section that may be under these people's control, and I don't want any problems. So, my intentions were to get the money from him, and once I got the money from him, I could contact Sayed and get where I had to go. But the informant was trying to come at me to radicalize me, put ISIS ideology on his head. I would challenge the things I had to say. I was openly challenging. He was saying, 'How can you kill one of these journalists? What is your intention?' 'I am worried about the family.' He said, 'I know your intention, but are you OK with this?"

He reported, "I didn't want to go along with anything. Once I received the money I'm free…They offered me the prospect of some work. They were like a supply line. They gave me money to keep my phone."

He reported that he understands Islam very well. "I've been Muslim since 15. I'm not ignorant." When he was in Syria the first time, he was invited to go to a Madrassa with financing but turned it down. He had a second invitation when he was in Egypt. To him, "Islam is a comprehensible religion. Based off sound logic…Give everyone your do justice. This was what Islam was to me."

"I was never exposed to radical stuff before I met this guy. The first time in my life that I was ever approached was through an agent of the U.S. government. When he told me who he was. – in Arabic – I barely understood. I didn't even know what group he was talking about." He added: "I never support any group…I've never had an extremist element in my life."

I asked him about Al-Alwaki. "He actually spoke for the us about anti-terrorism. His speeches were in every mosque. He had a lot of things that he said were Islamic. But there was a transition once he left the country. I don't' necessarily agree with all it but that was his choice. Am I a follower of that? I think it's unfortunate what happened to him and how it went about. A lot of people don't know he went to prison in Yemen. That is when he turned radical."

"I always try to have some kind of sense of justice. Every man woman and child deserves justice. That is what Islam believes. Some people just don't care about that man. My mindset was exposed to things beyond America. Since this I have shifted to that mindset too. Well if it isn't affecting my son, daughter, wife, so be it. It makes me feel lesser. Nobody is going to look after me."

In prison he stated, "I never look to convert anybody." He has not seen an Imam in prison. He kept Ramadan.

"The informant kept trying to pressure me to do different things. I'm feeling torn. I want to help the family. But someone is trying to handle to change what my intentions are to his agenda. I can cut him off completely or I can navigate these muddy waters and get the money and go.

"I hate saying the government, I say these agents, I don't feel like the others in this country have the same attitudes. I'm hoping that our country is still what we were founded upon. We have first Muslim congresswomen in Michigan and Minnesota. These got such backlash from other congressmen. Are we not better than this? I really hope that it's just a few bad apples."

"They purposely brought me in to an interview to violate my 5th amendment right against self-incrimination. They pressured me to come and speak to me. I had no intention. I went to speak to them.

They question they charged me, "Have you ever discussed ISIS with anyone?' I told them, 'I have talked to numerous people about ISIS. They didn't ask me, 'Did you talk to John about ISIS?' They wanted me to speak about the informant."

"I was pretty committed to travelling. I cut off that informant. I told him my purpose was this. You have tried to convert me to your agenda. Do not contact me again. Leave me alone." That was in March 2015.

When he was brought into custody he was extremely fearful: "I know very well they could torture me. Take me to a black cell. I was under the assumption that they were going to torture me…Everything I said was to prevent me from being tortured. Because they lied to me the whole time. I was acknowledging the things they were saying.

He denied any medical problems others that an injured lower back and hip.

He drinks alcohol socially, but denies any problems with alcohol include any DUI or detox. He smokes marijuana approximately every other day. He has tried cocaine a couple times.

He reported that in the context of the stress of his legal situation, he has felt anxious and depressed at times, but never sought or received mental health treatment.

On May 25, 2019, Dr. James Hilkey completed a psychological forensic evaluation of Mr. Smith. The purpose of the evaluation was to provide a personality profile of Mr. Smith to aid counsel in his representation. Mr. Smith met criteria for mild depressive and anxiety disorders, which are long-standing and exacerbated by his current legal situation. He also had some features consistent with paranoid and antisocial personality traits.

Now, reflecting on his situation he added: "I cut off everything to do with Middle East. My ambitions were dead and gone. I realized I can't make a difference. I was young and naïve thinking I could. This was where it got me."

**Question Presented: What is the likelihood of Mr. Smith committing future violence especially associated with Extremism?**

Based upon the aforementioned evidence, and in light of state-of-the-science models for assessing the risk for violence and involvement in international terrorism, Mr. Smith presents a ***no risk to low risk for violence associated with extremism***.

Before explaining Mr. Smith's situation, I will briefly explain my approach to assessment. First it should be noted that risk assessments do not predict future behavior. Rather, they can identify certain individual characteristics, which may indicate the likelihood to engage in certain behaviors. Second, I used a structured professional judgement approach to assessment which is based upon the state of the science for risk assessment for violence associated with extremism and violence in general.

Presently, there are a number of risks assessment tools, but these have not been validated in the relevant populations. For that reason, I did not rely upon any one tool, but drew upon the frameworks and risk and protective factors that are addressed in a number of tools include to guide my approach to collecting and analyzing data from Mr. Smith. These tools are summarized in a recent report from RTI International (https://www.dhs.gov/sites/default/files/publications/OPSR_TP_CVE-Application-Risk-Assessment-Tools-Criminal-Rehab-Process_2018Feb-508.pdf , and based on what is called a structured professional judgement approach, which combine statistically predictive, dynamic factors and clinical evaluation. These tools consists of items arranged in different categories. For example, the VERA-2 includes indicates associated with 25 risk factors and 6 protective factors arranged in these categories: (1) Beliefs and Attitudes, (2) Context and Intent, (3) History and Capability, and (4) Commitment and Motivation. Another example is RADAR which was developed by the Australian Government and which consists of two assessments: a screening assessment and an in-depth assessment. The screening assessment contains 15 indicators across three dimensions: (1) Ideology, (2) Social Relations and (3) Action Orientation.

Based upon my interview and review of the documents made available to me, I conclude that Mr. Smith does not demonstrate any past or present indicators for violence especially related to extremism in the areas of: *Beliefs, Attitudes, and Ideology; Intent and Motivation, and; History, Action and Capacity*. These are summarized below.

**Beliefs, Attitudes and Ideology**

- ***Mr. Smith is not committed to extremist ideology and does not advocate the use of violence***.
- He has no perceived grievance and or perceived injustice and does not dehumanize those associated with injustice.
- He support democratic society and values, including the U.S. government and its constitution and institutions.
- He has no hostility to U.S. national identify or American society.
- He expressed no intolerance for those outside of his group.

**Intent and Motivation**

- ***Mr. Smith did not seek or develop any materials related to violent extremism***.
- He has no personal contact with anyone associated with violent extremism, asides from the informant.
- He did not express an intention or willingness to be part of violent extremism, or to die for any cause.
- He made no plans or preparation for acts of violent extremism including no plans to travel to Syria.
- Mr. Smith showed no signs of motivation related to perceive religious obligation/glorification, criminal opportunism, camaraderie group belonging, moral obligation, moral superiority, excitement and adventure, or being forced.

**History, Action and Capacity**

- ***Mr. Smith had no early life exposure to violent extremist ideology. They Syrians he knew did not expose him to this type of ideology***.
- He has a network of family/friends involved from Syria, but none that were known to be involved in violent extremism.
- He has one conviction for Disorderly Conduct and Noise Ordinance Violation, but otherwise no prior history of prior criminal violence.
- He had no strategic paramilitary or explosive training
- He had no training in extremist ideology

**Indicators of General Psychosocial and Mental Health Vulnerability**

Mr. Smith had several indicators of general psychosocial and mental health vulnerability:

- He witnessed violence in his home as a child to his mother and sister.
- He had problematic upbringing including also divorce and estrangement from his father.
- He had problems with school, dropping out in the 10th grade.
- He was noncompliant with pre-trial supervision.

There were other indicators of general psychosocial and mental health vulnerability were not present in Mr. Smith:

- He had no criminal history as a juvenile.
- He has no history of being diagnosed with a depressive disorder and has made no suicide attempts.

- He has no evidence of diagnosis of a personality disorder, psychotic or schizophrenic disorder, autistic disorder, PTSD, or substance abuse disorder.

In summary, Mr. Smith did not show any indicators for violent extremism in the core categories of: *Beliefs, Attitudes and Ideology; Social Context and Intent; History, Action and Capacity, and; Commitment and Motivation*. Mr. Smith had some historical and current difficulties in his life, which could impact the risk for individual to engage with violent extremism, if he had any of the other indicators, which he does not.

In addition, at no point did Mr. Smith demonstrate an escalating pattern of behavior known as the Pathway to Violence. According to Meloy et al (2011), persons on this pathway may exhibit warning behaviors that indicate an increasing or accelerating risk of targeted violence. Mr. Smith has had no such warning behaviors.

## Conclusion and Recommendations

Based upon the aforementioned evidence, and in light of well-established models for assessing risk:

1. Mr. Smith presents no risk to low risk for violence especially involving extremism.
2. He does not demonstrate any past or present indicators for violence especially related to extremism in the areas of: *Beliefs, Attitudes, and Ideology*; *Intent and Motivation; or History, Action and Capacity*.
3. He does have some vulnerabilities associated with a difficult upbringing, but these do not indicate any specific risk for violence including that related to extremism.

I am happy to answer any questions that you may have regarding this report. I will await your further instructions. I can most easily be reached by email at smweine@uic.edu or by cell phone at 312-388-8416. Thank you for inviting me to consult on this case.

Sincerely,

Stevan Weine M.D.

cc: Kevin A. Tate
Counsel for Alexander Smith