**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | DOCKET NO. 3:17-CR-182-MOC |
| Plaintiff, | |
| vs. | **Sentencing Memorandum<br>Motion for Downward Departure/Variance** |
| ALEXANDER SAMUEL SMITH | |
| Defendant. | |

The terrorism adjustment under the Sentencing Guidelines recommends the statutory maximum; although it should not apply, the § 3553(a) factors mitigate for a sentence of time served (approximately 17 months) in this case. The Court should adopt Mr. Smith's legal arguments and apply a significant downward departure and/or variance based on the following:

1. The Terrorism Adjustment is inapplicable because Mr. Smith's false statements did not involve a federal crime of terrorism, nor actually obstruct an investigation into a specific terrorism offense.

2. The PSR's listed statutory maximum is inaccurate, because the two counts are multiplicitous, violating Double Jeopardy Clause, and merge into one offense with a 96-month maximum.

3. Even if the Court disagrees with Mr. Smith's legal positions, a significant Departure and/or Variance is warranted based on Mr. Smith's:

   a. Criminal History zero (0),

   b. His low risk to commit acts of extremism or affiliate with terrorist groups,

   c. The sentencing disparity the suggested guideline sentence would create as compared to other similarly situated defendants, and

   e. Mr. Smith's nearly 6-year post-offense rehabilitation since the August 2014-March 2015 interaction with informants paid to ensnare him in this case, and his sentencing in July of 2020.

1

**Alexander Smith's Story**

How did a then 24-year old born young man raised in Charlotte hook up with who he believed was an ISIS recruiter and get convicted of making false statements to the FBI in a matter involving international terrorism? As a biracial man raised by a single mother, he found acceptance in the Muslim religion and culture. His path, however, included a pernicious detour when he befriended a family who would later defend themselves in a brutal civil war alongside terrorist organizations. It is clear from all the evidence adduced in this case and at trial, that Mr. Smith's sole motivation to travel at any time to Syria was based on his love for the Kodamaiti family that had once taken him in as a youth.

1. **Mr. Smith's identity struggle that led him to embrace Islam.**

About twenty years after the Supreme Court found that laws prohibiting interracial unions violated the Equal Protection Clause, *Loving v. Virginia*, 388 U.S. 1 (1967), the son of one such couple—Alexander Smith—was born. Figuring out who you are is a formidable task for anyone, but it was especially so for Mr. Smith. "[M]ultiracials[,]" like Mr. Smith, "face the highest rate of exclusion of any group. They're never black enough, white enough, Latino enough." Jennifer Latson, *The Biracial Advantage*, Psychology Today (May 2019).[1] Indeed, Mr. Smith's maternal grandfather was a member of the Klu Klux Klan, who disowned his daughter for having biracial children.

Due to his mixed race, Mr. Smith was at higher-risk for stress-related health problems and being more prone to feel depressed, skip school, and smoke or drink alcohol. *Mixed-Race Teens Prone to Depression*, The Washington Post.[2] "The most common explanation for the high-risk status is the struggle with identity formation, leading to lack of self-esteem, social isolation and problems of family dynamics in biracial households." *Id.*

_____

[1] Available at < https://www.psychologytoday.com/us/articles/201905/the-biracial-advantage>.
[2] Available at < https://www.washingtonpost.com/archive/politics/2003/10/31/mixed-race-teens-prone-to-depression/ff04745b-be4a-473d-ac59-58abdda8845d/>.

Mr. Smith was born and (mostly) raised in Charlotte. He struggled growing up. He didn't have a relationship with his father and was instead raised by his mother. During his adolescence, she remarried for a few years to a man who abused her and her children. Alex would remember with shame and embarrassment, his inability to protect his mother and sister from the abuse.

Because his mother worked a lot to support her children, one of her friend's daughters moved in to watch Alex and his siblings. That daughter had a younger brother, Paco, who was three years older than Alex. Paco and Alex were like brothers, essentially growing up together. When Alex was fifteen years old, Paco was killed in a gang shooting a nightclub. Alex took the loss very hard. He began to study religion to cope with this loss.

Although he attended Sunday School and church previously, Mr. Smith found a connection with Islam and converted to Islam in 2004. In particular, the concept of God not suffering from human emotions like anger and jealousy and existing without form, as neither man, nor woman, or son or daughter, resonated with Mr. Smith. He became more involved in the religion—praying daily and participating in Ramadan, but also frequenting the Islamic Center of Charlotte and traveling with fellow Muslims to different seminars and lectures.

Unfortunately, the peace he found in Islam did not transfer to high school. In tenth grade, he dropped out following a fight with another student. He struggled with the passive structure of high school and decided that he would instead get a job to try and help his mother provide for their family.

2. **Smith is befriended by a Syrian family that would later get enmeshed in Syria's civil war.**

Alex met the Kodaimati family through an acquaintance at a flea market. At the time, Mr. Smith was an unemployed teenager looking for work and the father, Wael Kodaimati, offered him a job in his construction business. Wael proceeded to teach him different construction skills and Alex

became close with the family. In particular, Alex connected with Saeed, Wael's son who was around the same age (three years younger). Mr. Smith considered Saeed like a brother.

About eighteen months after meeting the Kodaimatis, Smith was invited to visit them in Syria. Saeed's mother had gotten sick and they were returning to their country. Alex spent a little less than a month in Syria with them. Although Alex really enjoyed Syrian food, he most fondly remembers the people. He felt that he was "finally in a place where I was just a person and didn't have to be white or black." As Alex explained, "In Syria, they don't see color. I was always judged for being biracial, but they saw me as a human."

Upon returning from Syria, Mr. Smith remained in contact with the Kodaimati family. They too returned to Charlotte from Syria, but would return to their native country in the midst of its civil war sometime around 2014.

Mr. Smith, along with others, would follow the news on what was occurring during the Arab Spring. The Arab Spring was a series of pro-democracy uprisings that enveloped several Muslim countries, including Tunisia, Morocco, Syria, Libya, Egypt, and Bahrain.[3] It began in December 2010 when a Tunisian street vendor set himself on fire in protest to the arbitrary seizing of his vegetable stand, which led to a successful uprising that inspired activists in other countries.[4]

Although the Arab Spring brought positive reform in some countries, it brought devastation to Syria. As one expert aptly described: "What started as an attempt by the regime of President Bashar al-Assad to shoot Syria's largest uprising into submission has devolved into a regionalized civil war that has partitioned the country into three general areas in which U.S.-designated terrorist

---

[3] History.com Editors, *Arab Spring* (Jan. 10, 2018), available at< https://www.history.com/topics/middle-east/arab-spring>
[4] *Id.*

organizations are dominant."[5] One of the more heinous examples of Bashar al-Assad's brutality Mr. Smith learned about occurred during the Spring of 2011 when a 13-year-old boy who was detained after his father took him to an anti-regime rally.[6] A month later, Syrian officials dropped off the boy's mutilated body to the family, which "show[ed] his battered, purple face. His skin scrawled with cuts, gashes, deep burns and bullet wounds that would have probably injured but not killed. His jaw and kneecaps [were] shattered…and his penis chopped off."[7]

Faced with such aggression, some Syrians fought back. Although this included terrorist organizations, such as ISIS and Jabhat al-Nusra (Al-Qaeda affiliate), it also included the *non-terrorist* opposition group called the *Free Syrian Army*. Tr. Vol 1 at 98, 138. The leader of one Free Syrian Army group explained its origination: "Picking up guns was not what we had in mind when we first took to the streets…But we were being slaughtered like lambs simply for peacefully protesting, what choice did we have? I myself saw two children no older than six die in front of my eyes. First, we had to protect our people and second, we realized the regime was not breaking down. We had to commit to the next step."[8]

The Free Syrian Army felt it had no option but to sometimes work with these terrorist organizations. One commander explained that, "[w]hen al-Nusra declared their allegiance to al-Qaida, the Free Army began to change its vision of the group, but we did not have the strength to do more than that. But we were suspicious…we wouldn't [have accepted al-Qaida in our midst] if we had more support and were more confident in our allies in the international community."[9] So, Jabhat al-Nusra

[5] Kathy Gilsinan, *The Confused Person's Guide to the Syrian Civil War: A brief primer*, The Atlantic (Oct. 29, 2015), available at < https://www.theatlantic.com/international/archive/2015/10/syrian-civil-war-guide-isis/410746/>.
[6] Mark Memmott, *In Syria, The Death of a 13-Year-Old Hamza Creates a Child Martyr*, NPR (May 31, 2011), available at < https://www.npr.org/sections/thetwo-way/2011/05/31/136812581/in-syria-the-death-of-13-year-old-hamza-creates-a-child-martyr>.
[7] *Id.*
[8] Charles Lister, *The Free Syrian Army: A decentralized insurgent band*, Center for Middle East Policy at Brookings at 10, available at <https://www.brookings.edu/wp-content/uploads/2016/11/iwr_20161123_free_syrian_army1.pdf>.
[9] *Id.* at 15.

"maintained a relatively pragmatic relationship" with the Free Syrian Army.[10] Although the Free Syrian Army's command level did not coordinate with al-Nusra, it acknowledged, "that there had been cooperation between FSA brigades and the Front on 'certain operations.'"[11]

### 3. The Kodaimati family is forced to join ISIS opposition groups.

Saeed Kodaimati became involved with these opposition groups. While in prison in Turkey in 2013, he met an Egyptian who had had been convicted in Austria of Educating and Nurturing a Terrorist Organization, was affiliated with al-Nusra and would later join ISIS. *US v. Kodaimati*, No. 3:15-cr-1298, Complaint, Dkt. #1 (S.D. Ca) at ¶ 33. Saeed later sought this man's help when a friend was kidnapped by ISIS. *Id.* at ¶ 34. He would work for the Sharia Authority in his Syrian region and, though he never pledged allegiance to ISIS, he did play a reconciliatory role with them where he "kind of fix[ed] problems to whoever ha[d] problems with [ISIS]." *Id.* at ¶ 32.

The Kodaimatis took up arms in Syria. Saeed and his father participated in a diversionary attack for the Free Syrian Army and al-Nusrah, where Saeed spent hours shooting at the Assad regime, whilst al-Nusrah captured some buildings that they still hold to this day. *Id.* at ¶ 46. Saeed also admitted that he would sometimes fill the gaps if al-Nusrah needed help fighting the regime. *Id.* at ¶ 42. He fought every few days for two or three weeks between April and July 2014. *Id.* at ¶ 43.

### 4. The FBI opens an investigation into Mr. Smith's desire to participate in the Syrian revolution.

The FBI opened an investigation into the Kodaimatis because of intelligence they were involved in supporting ISIS and into Mr. Smith based on information "he wanted to participate in the Syrian revolution." Tr. Vol I at 131. The source of this information was a confidential source living in

---

[10] *Id.* at 10.
[11] *Profile: Syria's al-Nusra Front*, BBC (Apr. 10, 2013), available at <https://www.bbc.com/news/world-middle-east-18048033>.

Memphis who was a friend of Wael Kodaimati.[12] The FBI had another confidential human source in Charlotte, known as Abu Khalid, pose as an ISIS recruiter and travel-facilitator to see if Smith was going to Syria to join ISIS. *Id.* at 137. [13]

At the first meeting, on August 7, 2014, Smith explained his intention to Khalid was to help the Kodaimati family in Syria.

```
25   ABU KHALID: So, Inshallah [Translation: God willing], tell me...
0002
 1   what you want...
 2   SMITH: There is a particular family in Syria... that I went there
 3   one time before to visit.  Inshallah [Translation: God willing],
 4   I want to go back to them Inshallah [Translation: God willing]
 5   and defend if something happens against them more or less. If...
 6   If they're attacked then I want to be able to defend them, if
 7   they are at peace then cool. Whatever they're involved in
 8   Inshallah [Translation: God willing], far as living their life
 9   and their way of life...
```

Govt. Exh. 4.

The FBI's source, however, told Smith that he's only helping those going to Syria to join ISIS. Exh. 4 at lines 18-20.

The FBI's sources were in contact with Mr. Smith for about eight months (Aug. 2014 to Mar. 2015). Mr. Smith was unemployed at the time, with no way of supporting any travel plans. So, the FBI provided Mr. Smith with income by getting one of its sources, Bilal, to pose as Khalid's friend who would find Mr. Smith work. That source had received over **$253,081** for his time and another **$23,000** in reimbursements, which even if divided by the number of years he worked for FBI would still

---

[12] The Memphis confidential source and his information would later prove to be unreliable. In fact, when subpoenaed by the defense for trial, he tendered a fraudulent doctors excuse to the Court, where after the an order was issued directing the government to produce him in Charlotte.
[13] Mr. Smith never did agree to travel to Syria and no evidence was gathered suggesting he intended to provide material support to ISIS. Consequently, he was ensnared in a FBI false statements trap.

7

amount to $23,000 a year. Vol. I at 223-24, 242. The FBI and/or its sources also supplied Mr. Smith with money to pay his phone bill and get gas, as well as gifting him a laptop. Vol I at 212, 216-18.

1. *At the time, Mr. Smith could have taken a bus from Charlotte to Boston for less than $10 and purchased a roundtrip ticket from Boston to Turkey for $576.[14]*

During a November meeting, when Khalid was talking generally about his travels, Mr. Smith said, "[If] you need a buddy pass or something like that to be on a cheaper flight, let me know." Gov. Exh. 7. Khalid declined, saying they took care of the tickets and stuff. *Id.* Mr. Smith's girlfriend worked at the Charlotte Airport for American Airlines (then USAir). As an airline employee, she got 16 one-way tickets with reduced rates for friends and family. Vol I at 264. These were standby tickets—there had to be an empty seat, which was filled based on rankings, the ticket *did "not guarantee[ ] passage"* on the flight. Vol. I at 270.

Four months later, Khalid reminded Smith of his offer and asked for a favor. Gov. Exh. 8. Khalid said that he had a brother "we need[ed]" and was trying to get tickets from Tampa to Buffalo then from Buffalo to Canada and Canada to Europe, "so I can send him you-know-where." *Id.* This was on Wednesday March 8th and Khalid told Smith he had to go by Sunday. *Id.* Smith booked the ticket about 48 hours later on March 20th for travel that Sunday on March 22nd. Gov. Exh. 12E.

Shortly after this, on April 11, 2015, Smith had his last contact with Khalid. Smith told Khalid *"I can't have anything to do with this. All I wanted was to go visit my friends to make sure he*

---

[14] TravelPirates, *Cheap Flights to Istanbul, Turkey from Boston, MA for $576 – round trip, taxes included!* (Sep. 25, 2014), available at <https://www.travelpirates.com/flights/cheap-flights-to-istanbul-turkey-from-boston-ma-for-dollar-576-round-trip-taxes-included_1078>. And there was a low-cost bus service that had routes from Charlotte to Washington, DC to New York City to Boston. *See* <https://us.megabus.com/> (offering tickets for as low as $1 with routes connecting Charlotte to Boston). *See also* SecretFlying (Dec. 2, 2014), available at <https://www.secretflying.com/posts/cheap-flights-from-boston-to-cairo-istanbul-556-return/> (offering a $556 plane ticket to Cairo with a 14-hour layover in Istanbul).

*and his family was okay. You then started asking me to do things I had no intention of doing."*
Vol II at 359.

   5. **The FBI aggressively seeks to interview Mr. Smith about the recorded discussions he had with their source.**

   Ten months later, in February of 2016, the FBI interviewed Mr. Smith where he made the statements underlying the indictment's charges. The FBI unsuccessfully attempted to get in touch with Mr. Smith prior to this, leaving him messages and telling his mother that they needed to speak with him. Vol II at 471-72. The FBI then put pressure on the girlfriend, which was discussed amongst the agents. The agents believed "she's going to be the weakest link" and commented, "you're going to tell us everything or you're going to jail and you're never getting out and your mother is going to die while you're in jail." Vol I at 231-32. The agents proceeded to go to her job and have airport security bring her to another room for an interview and she was subsequently fired. Vol I at 234. They also left a subpoena at her mother's house and texted the same to her. Vol I at 235. It was five days after she received the subpoena that Mr. Smith came in for the interview.

   It was in this interview that Mr. Smith made the statements that the jury found constituted false statements, including never discussing his desire or plans to travel to Syria and falsely stating he did not know Hilal intended to use the buddy pass to travel and support ISIS. During the interview, almost every question the FBI asked of Mr. Smith, the FBI already knew the answer. Vol II at 450. In addition, despite extensive cross-examination on the issue, the Agent could not identify any question which Mr. Smith lied about and the FBI did not already know the answer. Vol II at 450-60.

   The Agent acknowledged that Mr. Smith was honest about many of the questions asked during the interview. Vol II at 475. Mr. Smith accurately identified the Kodaimatis and Khalid and truthfully recounted how often he met with Khalid. Vol II at 464, 467, 469. He honestly recounted how Khalid paid him $80 for a ticket for Mohamed Hilal to get from Florida to New York. Vol I at 461-63, 465.

Indeed, the FBI did not know why Mr. Smith used someone else's debit card to purchase the buddy card, but later found out that Mr. Smith's response in the interview had been truthful (they did not accept cash). Vol II at 475. Mr. Smith told the FBI that the debit card owner was a friend and where he worked, so the FBI could subsequently interview him. Vol II at 464. And the FBI believed Mr. Smith's response that he would actually try to find Bilal for them. Vol II at 466-67.

More than a year and half later, Mr. Smith was charged in a two-count indictment with making false statements to the FBI in a matter involving international terrorism sixteen months after the interview. Indictment, Dkt. #3 (filed 06.21/2017). Twenty months later he went to trial. He was found guilty on both counts by a jury on March 21, 2019.

**Sentencing Factors**

I.     **The Court should find Mr. Smith's applicable Guideline range is 63 to 78 months.**

Mr. Smith has zero criminal history points and the obstruction-of-justice guideline, § 2J1.2, carries an offense level of 26 for a false statement that involves international terrorism. Draft PSR, Dkt. #89 at 7-9. Although this would equate to a recommended sentence of 63 to 78 months, the government argued, and the Probation Office agreed, that the terrorism adjustment, U.S.S.G. § 3A1.4, applies catapulting the recommendation to the statutory maximum and an artificial default Criminal History category VI. Final PSR, Dkt. #98.

    A.  **The terrorism adjustment does not apply because the offense did not involve a
        federal crime of terrorism or obstruct an investigation into such a crime.**

As detailed in the Defendant's Response to the Government's Objection to the Pre-Sentence Report (Dkt. #95), and expressly incorporated herein, the terrorism adjustment does not apply.

1.     **Mr. Smith's false statements did not involve a federal crime of terrorism.**

The government argues otherwise by claiming that Mr. Smith attempted to provide material support to ISIS. Even if that were true—and the defendant objects to any such claim---it doesn't matter. Mr. Smith was convicted of making a false statement and his sentence, including Chapter Three's terrorism adjustment, can only be based on act's and omissions that qualify as relevant conduct under § 1B1.3. U.S.S.G. § 1B1.3(a). This means that the terrorism adjustment must qualify based on Mr. Smith's acts or omissions during the commission of his false statements, in preparation for those false statements, or in the course of attempting to detection or responsibility for his false statements. U.S.S.G. § 1B1.3(a)(1).

Mr. Smith's actions from **June 2014 to April 2015** that the government believes constitute attempted material support are not relevant conduct for his false statements conviction. Mr. Smith's conversations and actions during 2014 to 2015 surely *did not occur "during" his purported lies at the 2016 FBI interview*. Nor could his actions taking place *before* uttering the false statements be an attempt to avoid detection of his false statements. Mr. Smith's discussions with Khalid and procurement of the buddy pass in 2014 and 2015 *were not done "in preparation"* for his false statements in 2016.

**2. Mr. Smith did not actually obstruct an investigation into a specific federal crime of terrorism.**

An application note does state that "obstruct[ing] an investigation of a federal crime of terrorism" constitutes promotion of a federal crime of terrorism triggering the adjustment. USSG § 3A1.4, n.2. But this standard *requires actual obstruction of a specific crime of terrorism. United States v. Benkahla*, 501 F.Supp.2d 748, 751 & 756 (E.D. Va. Aug.3, 2007).

The government already knew the truth, so Mr. Smith's false statements did not actually obstruct any investigation. While this did not render the statements immaterial under § 1001,[15] it does

---

[15] In finding Mr. Smith's false statements "material" under 18 U.S.C. § 1001, the jury was instructed that: "[i]t is irrelevant whether the false statement actually influenced or affected the FBI's decision-making process" and "[a] false statement may be material even if the FBI knew the statements were false when they were given. It is

preclude finding that the statements were an *actual obstruction* qualifying for the terrorism enhancement. *United States v. Biheiri*, 356 F.Supp.2d 589, 599-600 (E.D. Va. Feb. 9, 2005) (terrorism enhancement did not apply because the government could not demonstrate that false statements of information already known by agents obstructed a federal crime of terrorism).

Because the FBI had actual knowledge of the truth behind Mr. Smith's false statements, the FBI could not reasonably rely on those falsehoods, and thus the false statements caused no actual obstruction of the government's investigation. *Id.* at 599-600. Indeed, the terrorism adjustment often *does not* apply in false statements involving international terrorism. *See e.g., United States v. Shehadeh*, No. 1:10-CR-1020, 2013 WL 6049001 (E.D.N.Y. Nov. 14, 2013); *United States v. Fabjan Alameti*, No. 2:19-cr-13 (Mont.), Dkt. #45 at 5 (government withdrew its objection that terrorism adjustment applied to the defendant convicted of making false statements in a matter involving international terrorism).

**3.    Application Note 2 cannot support the terrorism adjustment, because it is plainly inconsistent with the Guideline.**

If an application note is inconsistent with a guideline, the guideline controls. *Stinson v. United States*, 508 U.S. 36, 43 (1993). *See also United States v. Winstead*, 890 F.3d 1082, 1090-92 (D.C. Cir. 2018) (holding that Application Note 1 of USSG § 4B1.2 is plainly inconsistent with § 4B1.2, so the guideline controlled and defendants attempt crime could not qualify for an enhancement based on the inconsistent application note); *United States v. Havis*, --- F.3d ---, 2019 WL 2376070 (6th Cir. 2019) (en banc) (same). The Guidelines' "commentary 'should be treated as an agency's interpretation of its own legislative rule.'" *United States v. Winstead*, 890 F.3d 1082, 1090 (D.C. Cir. 2018) (quoting *Stinson v. United States*, 508 U.S. 36, 44-45 (1993)). This means that the commentary may interpret "genuinely"

---

enough if the defendant's statement were aimed at misdirecting the agents." *See* Gov't Proposed Jury Instructions, Dkt. #56 at 46.

ambiguous guidelines, but "the [Commission's] reading must fall within the bounds of reasonable interpretation." *Kisor v. Wilkie*, --- S. Ct. ---, 2019 WL 2605554, *8 (2019).

Application note 2 is not a reasonable interpretation of § 3A1.4, because it impermissibly expands the guideline's unambiguous language. The guideline clearly defines offenses that qualify for the terrorism adjustment as "felon[ies] that involved, or w[ere] intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4. The commentary, however, expands upon this precisely enumerated category to add offenses that harbor/conceal a terrorist or obstruct an investigation of a federal crime of terrorism. U.S.S.G. § 3A.14, comment. (n.2). Such a substantive expansion of a guideline cannot be done via commentary. *See Winstead*, 890 F.3d at 1091-92 (Sentencing Commission cannot expand the definition of "controlled substances" via commentary, such an expansion is to be accomplished by amending the language of the guidelines and submitting the change for congressional view).

The interpretation itself is also not reasonable. The guideline applies a minimum offense level of 32 in Criminal History category VI, which is a *minimum 210-month sentence*, yet obstructing a terrorism investigation has a *statutory maximum of 96 months*, 18 U.S.C. § 1505; 18 U.S.C. § 1001(a), and harboring a terrorist has a *statutory maximum of 120 months*, 18 U.S.C. § 2339. The application note is adding offenses to a guideline that would lead to sentence recommendations more than double their statutory maximums. This significant discrepancy demonstrates that the Sentencing Commission's interpretation of § 3A1.4 in Application Note 2 is not reasonable.[16]

---

[16] Although the Fourth Circuit found that Application Note 2 was not inconsistent with the language of USSG § 3A1.4, *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008), this decision did not consider the inconsistency between the Guidelines' recommended sentence and the statutory maximum of the application note's enumerated crimes. The decision has also been undermined by the subsequent decisions in *Winstead* and *Havis*, and did not apply the recently clarified deference standard announced in *Kisor*.

Because Mr. Smith's false statements did not involve or promote a federal crime of terrorism, nor actually obstruct an investigation into a federal crime of terrorism, the terrorism adjustment does not apply.

## B. If the terrorism adjustment does apply, Mr. Smith's Guidelines range should be capped at 96 months because the counts of conviction are Multiplicitous

If the Court finds the terrorism adjustment applies, Mr. Smith's Guidelines would be a level 32 in category VI, recommending a sentence of 210 to 262 months. U.S.S.G., Chapter 5, Part A (Sentencing Table). This recommendation, however, exceeds the statutory maximum, so Mr. Smith's recommended sentence is the statutory maximum. U.S.S.G. § 5G1.2. Although Mr. Smith was charged and convicted on two counts of violating 18 U.S.C. § 1001, each of which carries an 8-year maximum penalty, these counts are multiplicitous and should be merged.

Pre-trial, Mr. Smith moved for one count to be dismissed due to multiplicity. Dkts. No. 71 (Motion to Dismiss, 78 (reply to Govt. Resp). The Court denied that request as it did not see any prejudice to the defendant, but noted **"the sentencing exposure may be different."** Tr. Vol. I at 9. And that is indeed the case now before the Court. Whether Mr. Smith's *single interview* may be support a single violation of 18 U.S.C. § 1001 or multiple violations will determine whether his recommended Guideline range is 96 months or 192 months. *See* PSR Dkt. #98 at ¶¶ 83-84, page 21 Objection Three.

As already explained in the Defendant's pleadings to dismiss a count for multiplicity (Dkts. No 71, 78), and expressly incorporated herein, the Court should merge the two false statement counts into a single offense for sentencing purposes. Binding Fourth Circuit precedent dictates that "[w]hen a defendant is charged with multiple violations of the same statute arising from the same course of conduct," as is Mr. Smith, "the court must consider '[w]hat Congress has made the allowable unit of prosecution'…." *United States v. Shrader*, 675 F.3d 300, 313 (4th Cir. 2012) (quoting *Bell v. United States*, 349 U.S. 81, 81 (1952)).

1. **Here, the plain language of 18 U.S.C. § 1001 demonstrates that Congress intended to punish a defendant's course of conduct, rather than individual false statements.**

The statute proscribes "*any* materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a)(2). "Any" means "one, some, or all indiscriminately of whatever quantity." So, for example, 18 U.S.C. § 2252A's prohibition on possessing "any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography" dictated the storage medium rather than each image therein as the allowable unit of prosecution. *United States v. Planck*, 493 F.3d 501, 505 (5th Cir. 2007).

Mr. Smith's false statements during a single, continuous interview on February 16, 2016 represent only one violation of 18 U.S.C § 1001, rather than multiple violations. Indeed, this U.S. Attorney's Office has charged multiple false statements arising from a single, continuous encounter as a single count. *See e.g., United States v. Sullivan*, Case No. 16-cr-00005, Superseding Indictment, Dkt. #44 at ¶¶ 34-35, *United States v. Strothers*, Case No. 3:16-CR-212, Superseding Indictment, Dkt. #27 at 2-3. And the related defendant to this case, Saeed Kodaimati, was charged with only a single violation for making multiple false statements during one interview. Case No. 3:15-cr-1298 (S.D. Ca.), Indictment, Dkt. #8 (charging seven distinct false statements that the defendant made in a March 10, 2015 interview as a single violation of 18 U.S.C. § 1001(a)(2)).

The government hinges its defense of charging Mr. Smith with multiple violations on a 28-year old unpublished per curiam opinion that, at the government's invitation, applied the wrong legal test. *See* Dkt. #73 at 2-3 (citing *United States v. Jameson*, 972 F.2d 343 at *10 (4th Cir. 1992) (unpublished)). There, the defendant argued that multiple violations of 18 U.S.C. § 1001 for false statements on a disclosure form was multiplicitous, which the government responded with by asserting that resolution turned on *Blockburger*'s differing "proof of a fact" standard. Govt. Br., *United States v. Jameson*, 1992 WL 12125874 at 44.

15

Of course, this is not the test. If *Blockburger* controlled questions of multiple violations of the same statutory provision, then defendants could be charged with near-limitless felon-in-possession violations, since a violation "could arguably occur every time a disqualified person picks up a firearm even though it is the same firearm or every time that person picks up a different firearm." *United States v. Dunford*, 148 F.3d 385, 389 (4th Cir. 1998). The government cannot so charge, because the question is not whether the violation requires proof of a different fact, but what is the correct unit of prosecution. *Id.* at 390 (holding that multiple possession of firearms and ammunition seized at the same time from the same house supports only one conviction). *See also United States v. Mason*, 611 F.2d 49, 52-53 (4th Cir. 1979) (holding that a defendant who had purchased multiple firearms in one transaction and had misrepresented his qualification to possess those firearms on separate information forms submitted for each firearm, could not be convicted of separate offenses for making false statements in connection with each firearm).

Even if the Court disagrees, it is at least ambiguous what the allowable unit of prosecution for a § 1001 violation is, so the rule of lenity requires that it be construed in the defendant's favor and the two counts merged into one for sentencing purposes. *United States v. Johnson*, 612 F.2d 843, 846 (4th Cir. 1979) ("When congressional intent concerning the unit of prosecution cannot be ascertained, lenity should prevail, and only one prosecution is permissible.").

## II. A variance to time served is sufficient but no greater than necessary to serve the § 3553(a) purposes in this case.

### A. The nature of the offense.

Although the Court found there was no inducement in denying the request for an entrapment instruction, the government's role in manufacturing this crime bears on the nature and seriousness of the offense. As Justice Ginsburg recognized, entrapment concerns are especially prevalent in § 1001 territory. *Brogan v. United States*, 522 U.S. 398, 411 (1998) (concurring in the judgment). This is because

16

"if an investigator finds it difficult to prove some elements of a crime, she can ask questions about other elements to which she already knows the answers. If the suspect lies, she can then use the crime she has prompted as leverage or can seek prosecution for the lie as a substitute for the crime she cannot prove." *Id.* A very similar scenario unfolded in this prosecution.

Here, Mr. Smith had desires to travel to Syria and protect friends caught in a devastating civil war. This was not illegal, however, so the FBI inserted a supposed ISIS recruiter into Mr. Smith's life, who offered Mr. Smith his desire, but at a cost—joining ISIS. Nevertheless, Mr. Smith never took a substantial step towards accepting the FBI's devil's bargain. After nearly a year of contact with this supposed ISIS recruiter, who helped Mr. Smith get jobs, money for bills, and a laptop, Mr. Smith never went beyond ambiguous thoughts. He never got a replacement passport to remove his past stay in Syria, never confirmed any date, never recruited anyone else, never trained for fighting, and never bought any ticket, or formulated any plan with any specific details.

As the FBI feared that its investigation would close, Saeed Kodaimati was interviewed on March 10, 2015, which would provide basis for his subsequent prosecution, it sought to pressure Smith into committing a criminal act he had consistently declined to commit. The FBI source, who provided an unemployed Smith with financial means whilst cultivating a relationship with him, asked for "a favor" that had to be done in a matter of days---get a plane ticket for a brother that had to depart in less than 96 hours. But even in this FBI-created pressure chamber, they still were only able to get Smith to merely provide a standby reservation for a flight. Mr. Smith provided no money for the ticket and the ticket itself did not even guarantee passage, just an opportunity to, perhaps, clear the standby list.

With little to show for an investigation that lasted about a year and included two sources and expending who knows how many thousands of dollars, the FBI decided that it should "interview" Mr.

17

Smith by asking him questions regarding the discussions for which the FBI already had complete recordings. Mr. Smith wasn't interested in speaking with them, however, so they called his mother and told her the FBI needed to speak with him and then turned to the girlfriend, who they believed was "the weakest link"—showing up at her job and having airport security bring her into an interview room and texting her that they left a subpoena with her mother.

During the interview, nearly every question asked of Mr. Smith, the FBI already knew the answer. Indeed, the agent testified to paragraphs-long explanations for his actions, but could not identify a single question for which the FBI did not know the answer and Mr. Smith lied. And at one point, the FBI agent acknowledged that the main concern of the interview was "ask[ing] him about his own discussions of his plans to travel and the buddy pass[.]" Vol II at 463. However, the FBI already knew the precise details of those discussions; they were made to an FBI source(s) and recorded by the FBI.

The government recently moved to dismiss a criminal information charging a false statement, to which the defendant already pled guilty, with prejudice based on similar facts. *United States v. Flynn*, No. 17-cr-232 (D.C.), Dkt. #198. There, the defendant pled guilty to falsely telling the FBI a series of false statements about his communications with the Russian Ambassador. *Flynn*, No. 17-cr-232, Statement of the Offense at Dkt. #4. In defending the decision to drop the prosecution, the government explained that "whether [the defendant] did or 'did not recall' communications already known by the FBI was assuredly not material." *Id.* at 17. There, "the FBI had in its possession word-for-word transcripts of the actual communications" by the defendant, so "there was no question at the FBI as to the content of the calls[.]" *Id.* at 14. "The government [could not] explain, much less prove to a jury beyond a reasonable doubt, [that] false statements [were] 'material' to an investigation that…seem[ed] to have been undertaken only to elicit those very false statements and thereby criminalize [the defendant]." *Id.* at 17.

18

Mr. Smith was a young Muslim man with a personal connection and friends in the Syrian civil war, the FBI told him that to help the Syrian revolution ne needed to join ISIS. He never accepted this bargain, but the FBI nevertheless inserted itself into Mr. Smith's life to get answers about what he said during communications that were recorded by the FBI. Obviously, 18 U.S.C. § 1001 prohibits making material false statements to the FBI, but the circumstances of this particular false statement case are less severe because of the government's role in manufacturing this crime in the first place.

### B. A time served sentence reflects Mr. Smith's low risk of recidivism and adequately deters him and others from similar crimes.

The seventeen months of imprisonment Mr. Smith has already served are sufficient, but no greater than necessary to serve deterrent purposes and protect against Mr. Smith's risk of recidivating.

The consequences Mr. Smith has already endured are significant and especially effective discouragement for him, or anyone else, who thinks about lying to the FBI in a matter involving terrorism. He has been incarcerated at Mecklenburg County Jail since his guilty verdict on March 21, 2019. PSR, Dkt. #98 at 1. Mr. Smith now has a felony conviction—his first such conviction. His wife lost the job she held for 13 years at the airport as a result of this offense. Most importantly, Mr. Smith has missed major markers in his children's lives as a result of his offense. He missed his son's first two birthdays and the birth of his daughter. He did not get to witness their first steps or hear his daughter's first words. Instead, he was locked away and forced to be a spectator of his wife's struggles in caring for their children and his nieces and nephews, who also reside with her.

This punishment has already caused Mr. Smith to seriously reevaluate his life, priorities, and actions. According to him,

> "My whole outlook has changed after their births. I am not the same guy who would rush headlong into a fight without

worrying about my own personal safety. Nor am I willing to
travel half-way across the world to stand-up to oppression. My
duty is to protect and raise my kids."

Since the underlying offense conduct, Mr. Smith married his long-term girlfriend, his first child was
born, and his second child would be born shortly after being detained upon his guilty verdict. His
family has struggled in his absence as his wife cannot work much and watch their children (and the
nieces and nephews who reside with them). Mr. Smith is hardworking and has always diligently sought
employment in order to ensure he can provide the basic necessities. His family needs his help to raise
his children and provide for themselves.

Mr. Smith has a very low risk of recidivism as evidence by his lack of criminal history, expert
evaluation, and release on pre-trial supervision during this case.

Mr. Smith has zero criminal history points. Dkt. #98 at ¶¶ 54-55. He has never been convicted
of any drug offense or violent offense. His prior criminal justice charges include a speeding and
window tint violation, and a disorderly conduct and noise ordinance violation when he was eighteen
years old. Dkt. #98 at ¶¶ 51-53.

Indeed, the Probation Office, Magistrate, and government permitted Mr. Smith to be released
under pre-trial supervision for nearly two years. During this time, Mr. Smith worked as a security guard
and was permitted to carry a weapon without objection. And, similarly, the government did not raise
alarms over Mr. Smith jeopardizing community safety and instead waited more than a year after the
interview and more than two years after Mr. Smith began speaking with a supposed-ISIS recruiter to
bring charges against him.

Dr. Stevan Weine, a licensed Psychologist and longtime Co-Director of the American
Psychiatric Association's Committee on Terrorism and Political Violence, evaluated Mr. Smith and
found that:

- Mr. Smith presents no risk to low risk for violence especially involving extremism;

- He demonstrates no past or present indicators especially related to extremism in the core categories of Belief/Ideology, Intent/Motivation, and History Action and Capacity;

- And though Mr. Smith has some vulnerabilities associated with a difficult upbringing, these do not indicate any specific risk for violence including that related to extremism.

*Expert Report*, Dkt. #102-1 at 9.

As to the indicators for violent extremism, Dr. Weine found Mr. Smith was not committed to extremist ideology, nor did he advocate the use of violence. *Id.* at 8. He had no early life exposure to violent extremist ideology and did not seek or develop materials related to violent extremist ideology. *Id.* Although terrorism is most assuredly extremely serious, the problem is this is not a terrorism case. Indeed, the government acknowledged as much to the Court:

```
11          THE COURT:  It does.  It does.  But it doesn't --
12   what doesn't help me is you bring a case that is a -- that on
13   its face is he didn't tell the truth to the FBI, which is the
14   case.  And then on the other it has a -- it has this massive
15   sentence and you bring it in and demand that sentence.  And
16   then you play to the press, "Oh, we did all we could do."  And
17   then the judge -- when in truth all of us know this is not the
18   case that terrorism was made to enhance for 20 years.
19          MR. SAVAGE:  Right.
```

Vol. III at 533.

A time served sentence of sixteen months levies a serious punishment that promotes deterrence and protects against recidivism. Moreover, recidivism can further be addressed by this Court with a term of supervision and appropriate conditions to ensure that Mr. Smith's current conviction remains his only conviction.[17]

---

[17] If the Court denies Mr. Smith's objections to the final Guideline recommendation, applying the terrorism adjustment and landing on a 192-month recommendation, Mr. Smith requests a downward departure for an overstated criminal

**C.  A significant downward variance is necessary to avoid unwarranted disparities amongst similarly situated defendants.**

A time served sentence of about 17 months for Mr. Smith is in accord with sentences imposed on similarly situated defendants.  From 2012 to 2017, there were eleven defendants convicted of an obstruction offense (18 U.S.C. § 1001 or 18 U.S.C. § 1505 for obstructing a proceeding) that received the terrorism adjustment.[18] *See* U.S.S.C Data, attached as Exhibit A. Of these, four had a Guideline recommendation of the 96-month statutory maximum and all but one received a sentence of 48 months or less.

Counsel was able to locate fourteen cases involving false statements on terrorism. The list of these cases, a summary of their facts, and the final sentence have been included as a chart attached as Exhibit B. These cases confirm that a sentence over five years is reserved the most egregious false statements. Only two defendants received the 96-month statutory maximum: Saeed Kodaimati who lied about actually fighting with terrorist organizations and a repeat violent felon, who, in addition to lying about his brother joining ISIS, was also simultaneously sentenced to 120 months for having a cache of body armor and firearms. The next highest sentence, 67 months, was imposed on a defendant who had actually obstructed the FBI's investigation into an ISIS-related attack in Texas by making false statements and tampering with a witness. *United States v. Abdul Khabir Wahid*, No. 2:17-cr-360 (Ariz.).

---

history. As explained above, Mr. Smith's lack of criminal history, time under government observation and supervision, and expert assessment provide reliable information that the terrorism adjustment's automatic elevation to category VI overstates Mr. Smith's risk of recidivism. *See* U.S.S.G. § 4A1.3(b) (authorizing a downward departure ""[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."). Accordingly a departure to a category I offender is appropriate in this case and would yield a sentence of 121 to 151 months for an offense level 32. And the other § 3553(a) factors in this case support a variance far below that recommendation.

[18] The Commission makes a publicly available dataset that records dozens of variables with respect to every sentence imposed in the country for the past several years. It is available at https://www.ussc.gov/research/datafiles/commission-datafiles. A copy of a search for sentences under § 2J1.2 that received the terrorism adjustment has been attached as an exhibit.

Defendants who merely make false statements involving terrorism and did not advocate violence received sentences in the two- to three-year range. This included two co-defendants found guilty after a bench trial of making false statements to FBI regarding their friend supporting ISIS and attempting to travel overseas. *United States v. Soufian Amri*, No. 1:17-cr-50 (E.D.Va.) (24-month sentence); *United States v. Michael Queen*, No. 1:17-cr-50 (E.D.Va.) (24-month sentence). And a twenty-two year old who pled to making false statements about the existence, duration, and use of social media to communicate with ISIS members and was sentenced to 38 months imprisonment. *United States v. Abdul Raheem Habil Ali-Skelton*, No. 0:16-cr-77 (Minn.).

Indeed, even in sentences for the more serious crime of providing material support to a terrorist organization significant downward variances are commonplace. For example, in one case a 20-year old was stopped at the gate from boarding a plane to Istanbul to join ISIS. *United States v. Islam Said Natsheh*, No. 3:16-cr-166 (N.D. Ca.). Although the terrorism adjustment applied and the government advocated for a 15-year sentence, the court imposed a 60-month sentence. Judgment, Dkt. #24. The Court found that comparable cases were sentenced in the 36 to 84-month range. *Natsheh*, No. 3:16-cr-166 (N.D. Ca.), Sentencing Transcript, Dkt. #26 at 22-32. And, Natsheh's was a less serious support case, since he did not recruit others, nor obtain training prior to traveling, and had supplied neither weapons, nor financial assistance. *Id.* In another case, the defendant provided material support to ISIS by attempting to join until his family tricked him into returning to the U.S. and then gave money and contacts for a friend to join ISIS. *United States v. Asher Abid Khan*, No. 4:15-cr-263 (S.D. Tx.). At a resentencing on remand, the Court commented that the defendant "was teenage stupid" and "exercised abysmal judgment[,]" but found an 18-month sentence sufficient but no greater than necessary. Sentencing Transcript, Dkt. #191 at 5.

Terrorism is literally a deadly serious crime. But courts have recognized that making a false statement involving international terrorism is not akin to engaging in terrorism and have sentenced

accordingly. For the immature and misguided who attempt to obscure their past mistakes from the FBI, like Mr. Smith, a sentence of 17 months accords with sentences imposed on like offenders and is sufficient but no greater than necessary to serve the § 3553(a) purposes.

**D**.      **Mr. Smith's status as a non-violent offender and his nearly 6-Year Post Offense Rehabilitation Warrants a Time Served Sentence.**

Mr. Smith's PSR reflects he has zero (0) criminal history points. Despite his present conviction, there is no evidence that he committed any act of violence or would have a propensity to commit violent acts in the future; or any other offense that would warrant a sentence of imprisonment. After all, Mr. Smith was "set up" in a fake 2014-2015 pseudo-terrorist investigation that appropriately yielded no charges. A year and a half later, the FBI cajoled him into submitting to an interview for the purpose of bringing § 1001 charges.

Since the inception of the FBI investigation in **2014,** being charged in **June of 2017**, and tried in **March of 2019**, Mr. Smith has taken a number of important and tangible steps to ensure that he is on track to living a law-abiding and productive remainder of his life. He is now the father of two young children, and has a renewed value for law-abiding family life. He has served 17 months imprisoned in one of the worst of places—the local county jail. This Court has the authority and should depart downward and/or on this basis as well.

24

## Conclusion

Following the 2014 FBI undercover investigation, Mr. Smith committed no criminal offenses, let alone, acts of terrorism in the 5 years that passed before his trial in March of 2019. For the foregoing reasons, a sentence of time served is sufficient but no greater than necessary to serve the § 3553(a) sentencing factors in this case.

Dated: July 24, 2020                    Respectfully Submitted,

s/ Kevin A. Tate
Kevin A. Tate
NC Bar 38548
Senior Litigation Counsel
E-Mail: kevin_tate@fd.org
Melissa S. Baldwin
MA Bar 690012
Assist. Federal Public Defender
Melissa_Baldwin@fd.org

Federal Public Defender for the
Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720
Fax: (704) 374-0722
Counsel for Alexander Samuel Smith